COLORADO COURT OF APPEALS                                    **2017COA81**

Court of Appeals No. 14CA0562
El Paso County District Court No. 13CR3349
Honorable Thomas K. Kane, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kyree Davon Howard-Walker,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BERGER
Dailey and J. Jones, JJ., concur

Announced June 15, 2017

Cynthia H. Coffman, Attorney General, Matthew S. Holman, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, M. Shelby Deeney, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     A jury convicted defendant, Kyree Davon Howard-Walker, of first degree burglary and conspiracy to commit first degree burglary. He appeals, arguing that the trial court erred in (1) denying his three challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986), to allegedly discriminatory peremptory strikes; (2) admitting allegedly improper testimony from one of the investigating detectives; and (3) failing to instruct the jury on the predicate crime of theft and failing to define "intent." He also claims that the prosecutor engaged in misconduct and that that the cumulative effect of these errors requires reversal.

¶ 2     We conclude that there were several trial errors, most resulting from prosecutorial overreach and one instance of prosecutorial misconduct. Howard-Walker's counsel objected to almost none of these errors and the standard of review for almost all of them is thus plain error. None of these errors, considered by themselves, requires reversal. Moreover, these errors did not substantially prejudice Howard-Walker's right to a fair trial and thus do not require reversal under the cumulative error doctrine. Therefore, we affirm the judgment.

## I. Relevant Facts and Procedural History

¶ 3      The victim, the owner of a marijuana business, left his home one night to run errands and spend time with his girlfriend. When he returned home the next day, he discovered an open garage door, a window which had been broken, and his bedroom in disarray. The contents of the unlocked safe in his bedroom (he had evidently forgotten to lock the safe) — some $8000 in cash, several watches, other pieces of jewelry, and a number of credit cards — were gone.

¶ 4      Video from a motion-activated surveillance camera showed two men (whom the victim did not recognize) entering the victim's bedroom. Both of the men were wearing baseball caps and sunglasses, and one — allegedly, Howard-Walker — was holding a gun. The video showed the men searching the room, opening the safe, and removing its contents. After viewing the video, the victim reported the burglary to the police.

¶ 5      A police officer responded to the victim's home. The officer viewed the surveillance video and took a copy of the video as evidence. Near the broken window, the officer discovered footprints which the victim said did not belong to him. The officer measured and took photographs of the footprints. Consistent with the police

department's policy for "cold" burglaries, no crime scene technicians were called to the scene.

¶ 6 After the officer left, the victim, who also owned a video-editing business, edited the surveillance video and made a shorter, clearer, "enhanced" version. He sent it to a number of media outlets and offered a reward of $1000 for information about the perpetrators. Some of the media outlets played the video on local television stations and advertised the reward.

¶ 7 Howard-Walker's girlfriend's uncle supposedly recognized him from a news broadcast and contacted the police. He told the police that, although it was difficult to discern the faces of the two men committing the burglary, he recognized the hat and sunglasses that Howard-Walker was wearing in the video. He also provided the police with a photograph of Howard-Walker wearing a similar hat and sunglasses.

¶ 8 Based on the uncle's tip, one of the investigating officers, Detective Mark Garcia, contacted Howard-Walker's probation officer. He showed the probation officer several still photos derived from the surveillance video and asked if he recognized Howard-

Walker. The probation officer said that he was "ninety-five percent sure" that Howard-Walker was depicted in the photos.

¶ 9     The police arrested Howard-Walker, and Detective Garcia interviewed him after advising him of his *Miranda* rights. Howard-Walker consistently denied that he committed the burglary. However, at one point near the end of the interview, Howard-Walker asked the detective "what it would get him if he gave [Detective Garcia] the name of the other person." The detective responded that if Howard-Walker identified the other burglar, he would apprise the district attorney of Howard-Walker's assistance, which would "help him," but promised no concessions. Howard-Walker later refused to speak further with the police.

¶ 10    Detective Garcia then searched (under a warrant) Howard-Walker's apartment. He found none of the stolen items; none of those items were ever recovered by the police. He also showed Howard-Walker's live-in girlfriend the still photographs from the surveillance video and asked if she recognized the person in the photos. According to the detective, the girlfriend initially told him that she was "eighty percent" certain that one of the men in the photos was Howard-Walker. At trial, the girlfriend denied making,

and then recanted, that statement, claiming that Detective Garcia had intimidated her into identifying Howard-Walker.

¶ 11 Detective Garcia also compared the photographs of the footprints found at the scene of the burglary with the shoes that Howard-Walker was wearing at the time of his arrest, and concluded (and testified) that the footprints matched the shoes.

¶ 12 The prosecution charged Howard-Walker with first degree burglary, *see* § 18-4-202(1), C.R.S. 2016, and conspiracy to commit first degree burglary, *see* § 18-2-201, C.R.S. 2016.

¶ 13 Howard-Walker's defense at trial was that he did not commit the burglary and that the witnesses had misidentified him from the video and still photos. The jury convicted Howard-Walker as charged, necessarily rejecting his misidentification defense. The trial court sentenced him to thirteen years in the custody of the Department of Corrections.

## II. *Batson* Challenges

¶ 14 Howard-Walker contends that the trial court erred when it denied his *Batson* challenges to the prosecutor's peremptory strikes excusing three prospective jurors — one who identified himself as African-American, and two who identified themselves as Hispanic.

Specifically, he challenges the trial court's rulings on the third *Batson* step, asserting that the prosecutor's stated "race-neutral" reasons for removing the jurors were not worthy of belief.

## A. Standard of Review

¶ 15    The United States and Colorado Constitutions prohibit peremptory strikes to dismiss prospective jurors on the basis of race, gender, or ethnicity. *Batson*, 476 U.S. at 85-87; *People v. Beauvais*, 2017 CO 34, ¶ 20; *People v. Lucero*, 2014 COA 53. In *Batson*, the Supreme Court prescribed a three-step process to evaluate claims of purposeful discrimination in jury selection.

¶ 16    First, the person challenging a peremptory strike must make a prima facie showing that the prosecutor used a peremptory strike to exclude a prospective juror based on his or her race. *Batson*, 476 U.S. at 96; *Beauvais*, ¶ 21.[1] A prima facie showing requires only

---

[1] While *Batson v. Kentucky*, 476 U.S. 79 (1986), refers only to race as an impermissible discriminatory factor, its progeny also includes gender and ethnicity within *Batson*'s proscription. *See, e.g., People v. Lucero*, 2014 COA 53. Whereas "African-American" typically describes a person's race, the term "Hispanic" is used sometimes to describe a person's race and other times to describe a person's ethnicity. Because it is equally impermissible to discriminate based on race and ethnicity, we apply those cases discussing race to the challenges of the two jurors who identified themselves as Hispanic. *See, e.g., Hernandez v. New York*, 500 U.S. 352, 355 (1991).

6

that the challenger "present evidence sufficient to raise an inference that discrimination occurred." *Valdez v. People*, 966 P.2d 587, 590 (Colo. 1998).

¶ 17    If the challenger meets his burden under step one of *Batson,* the burden shifts to the prosecutor to articulate a non-discriminatory reason for the strike. *Id.*

¶ 18    If the prosecutor does so, step three of *Batson* requires the trial court, after giving the challenger an opportunity to rebut the prosecutor's reason for the strike, to determine if the prosecutor's reason is worthy of belief or is, instead, pretextual. *Id.* If the trial court finds, based on a preponderance of the evidence, that the prosecutor's reason is pretextual, the court must deny the peremptory strike. *Batson*, 476 U.S. at 85-87. "[T]he ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [objecting party]." *Beauvais*, ¶ 24 (citation omitted). Accordingly, a trial court should sustain a *Batson* objection only if "the striking party's non-discriminatory reasons are sufficiently incredible that the discriminatory hypothesis better fits the evidence." *Id.* (citation omitted).

¶ 19    We review de novo whether the parties have met their respective burdens under *Batson* steps one and two. *Valdez*, 966 P.2d at 590-91. We review the trial court's *Batson* step three determination of whether the prosecutor's strike was motivated by purposeful discrimination for clear error. *People v. Robinson*, 187 P.3d 1166, 1174 (Colo. App. 2008); *People v. Gabler*, 958 P.2d 505, 507 (Colo. App. 1997). We give considerable deference to a trial court's *Batson* step three findings because "[o]nly the trial court can assess non-verbal cues, such as hesitation, voice inflection, and facial expressions, that are not recorded on a transcript." *People v. Wilson*, 2015 CO 54M, ¶ 18. Given this deferential standard, reversal of a trial court's factual determination that the strike was not motivated by discriminatory animus is justified only under "exceptional circumstances." *Beauvais*, ¶ 22 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)).

### B. Analysis of the Peremptory Strikes

¶ 20    We address each of the peremptory strikes in turn.

#### 1. Female Hispanic Juror

¶ 21    The prosecutor exercised a peremptory strike against a female juror who identified herself as Hispanic on her jury questionnaire.

8

This met Howard-Walker's minimal step one *Batson* burden. In response to Howard-Walker's challenge, the prosecutor said that the juror had "apparently filled out her jury questionnaire." Because the significance of the juror having filled out the questionnaire (as all of the other prospective jurors had done) is unclear, we presume that the prosecutor's statement as reflected in the record resulted from a transcription error. The prosecutor also claimed that she had "seemed jumpy" during voir dire, and contended that the prospective juror "didn't want to be here."

¶ 22    The trial court did not review the juror's questionnaire, but, in denying the *Batson* challenge, said it "trust[ed]" the prosecutor's characterization of what was said in the questionnaire. The court further explained that it had observed the female juror during voir dire and that she "seemed disinterested."

¶ 23    We first reject Howard-Walker's argument that the trial court's decision not to review the female juror's questionnaire amounted to a summary denial of his *Batson* challenge and reflected the court's failure to weigh the evidence.

¶ 24    One important tool that a trial court uses to determine whether the objecting party proved that the striking party exercised

its peremptory challenges with "discriminatory animus" is "an assessment of the striking party's credibility and the plausibility of its non-discriminatory explanations." *Id.* at ¶ 23. Having observed the demeanor of the prospective juror (and, for that matter, the prosecutor), the trial court was entitled to credit the prosecutor's assessment that the juror "did not want to be here." *See id.* at ¶ 25; *Wilson,* ¶ 14. And, though the prosecutor did not question the juror prior to exercising his strike against her, which might raise an inference of purposeful discrimination, *Gabler,* 958 P.2d at 508, the trial court agreed that the juror had seemed "disinterested." A prospective juror's disinterest in the proceedings is a legitimate, non-discriminatory reason for exercising a peremptory strike. *See, e.g., Beauvais,* ¶ 9 (use of peremptory strikes against two jurors who had not been directly questioned because both jurors "looked disinterested" did not violate *Batson*). Howard-Walker did not then and does not now attempt to refute the trial court's assessment of the juror's level of interest in the proceedings.

¶ 25 We reject Howard-Walker's argument that the trial court committed legal error in considering that the female Hispanic juror was not of the same race as Howard-Walker. Though we agree that

*Batson* does not require that the excluded juror share the same racial identity as the defendant, *Valdez*, 966 P.2d at 589, our reading of the record does not support Howard-Walker's argument. While the trial court noted that it perceived the female juror as "a person of color[,] . . . [a]lbeit not the same ethnicity as the defendant," it rested its denial of the *Batson* challenge on the juror's lack of interest in the proceedings, not on any comparison of the races of the juror and Howard-Walker.

¶ 26 Thus, we conclude that the trial court's *Batson* step three findings with respect to the female Hispanic juror are supported by the record.

### 2. African-American Male Juror

¶ 27 After the prosecutor exercised four of the prosecution's six peremptory strikes, he accepted the jury as then constituted, which defense counsel characterized as "completely white." Howard-Walker continued exercising his peremptory strikes, which resulted in a male juror who identified himself as African-American joining the panel. Despite having previously accepted the jury, the prosecutor then exercised one of its remaining peremptory strikes against that juror.

11

¶ 28    In response to Howard-Walker's *Batson* challenge, the prosecutor explained that the prospective juror "seemed anti-prosecution" because, in response to voir dire questions, he said that police officers often misidentify suspects and he indicated on his jury questionnaire that he had had a "particularly bad experience" with law enforcement. Howard-Walker attempted to rebut this explanation by noting that some unchallenged white jurors had expressed similar opinions about police misidentification and also reported negative experiences with the police.

¶ 29    The trial court denied the *Batson* challenge, saying that "this isn't a pattern yet" and because, based on its own observations, the juror apparently believed that law enforcement officers often make mistakes.

¶ 30    Howard-Walker asserts that the prosecutor's retention of a white juror who had discussed his negative views of police officers at some length and its retention of other white jurors who had expressed that the police sometimes make mistakes in identifying suspects demonstrated that the prosecutor's reasons for the strike was pretexual. "A prosecutor's disparate treatment of prospective

jurors, who, but for their race, have similar and allegedly objectionable experiences, is pretextual." *Gabler*, 958 P.2d at 508.

¶ 31    The Colorado Supreme Court in *Beauvais* recently clarified the required procedure for a *Batson* comparative juror analysis. While "[t]wo potential jurors need not be identical in every respect," "[i]solated similarities do not automatically render two jurors 'similarly situated' for purposes of deciding a *Batson* challenge." *Beauvais*, ¶ 56. For example, "if an attorney strikes a female potential juror because she is unemployed *and* lacks a college degree, a male potential juror who is *either* unemployed *or* lacks a college degree would not be similarly situated and not suitable for comparison." *Id.* at ¶ 57.

¶ 32    At least three white jurors who served on the jury expressed views similar to the male African-American's juror's that police sometimes make mistakes in identifying suspects. But none of those jurors also expressed that they had had "a particularly bad experience" with law enforcement. Moreover, the record demonstrates that these jurors' statements were more limited in scope, while the African-American prospective juror's statements were broader and less deferential to the police, particularly in

regard to identification of a suspect in a photograph or video. For instance, while one of the other jurors said that misidentification sometimes happens, she also said that misidentification might result from not getting "the best look" at the person. Another juror similarly said that misidentification might occur due to any number of circumstances, including the time of day and distance. Still another asserted that misidentification could occur based on a video or photograph if either of those mediums lacked clarity.

¶ 33 In contrast, the African-American juror opined that police officers are no better at identifying a person in a photograph or video than anyone else, and that misidentification may occur unless the photograph or video was completely clear.

¶ 34 Having observed the prospective juror's responses to questions during voir dire, the trial court agreed with the prosecutor's assessment that the African-American juror seemed "anti-prosecution," an assessment that has record support. Additionally, we note that the prosecutor exercised a peremptory strike against a white juror who had similarly expressed that "policemen are humans so they can make errors just like anybody else."

¶ 35    Howard-Walker also asserts the prosecutor's reasons for exercising a peremptory strike against the prospective juror were pretextual because, although the juror indicated on his jury questionnaire that he had had a negative experience with law enforcement, no strikes were exercised against white jurors who had also indicated negative experiences with law enforcement on their questionnaires. We reject this argument because there is no indication in the record that the trial court relied on the juror's negative experience with law enforcement to deny Howard-Walker's *Batson* challenge. And, as we noted above, no other juror disclosed *both* a negative experience with law enforcement and a belief that police officers sometimes misidentify suspects; thus, no other juror was similarly situated to the excused juror. *Id.* at ¶¶ 56-57.

¶ 36    We recognize that the trial court said, with respect to the denial of Howard-Walker's challenge of the strike against the African-American juror, that "this isn't a pattern yet." Had the court concluded that Howard-Walker had not proved purposeful discrimination with respect to the juror *because* he had not established a "pattern" of discrimination, that would have been error. A pattern of strikes may "give rise to an inference of

15

discrimination," but is not "a necessary predicate to a [*Batson*]

violation." *Batson*, 476 U.S. at 95-97. But the court did not rest its

*Batson* step three determination on whether Howard-Walker had

proved a pattern. Rather, the court, with record support, concluded

that the juror believed that police officers frequently misidentified

suspects — a central issue in the case. Howard-Walker does not

dispute that the juror expressed that police officers may misidentify

suspects. Based on the juror's responses to voir dire questions,

and with deference to the court's superior opportunity to judge the

juror's demeanor, we discern no clear error by the court in

concluding that the prosecutor's race-neutral reasons for excusing

that juror were credible.

### 3. Male Hispanic Juror

¶ 37 After the African-American prospective juror was excused,

another male juror, who identified himself as Hispanic, joined the

panel. The prosecutor exercised his final peremptory strike against

the juror. In response to Howard-Walker's *Batson* challenge, the

prosecutor explained that the juror had reported a bad experience

with law enforcement on his jury questionnaire, had faced a

criminal conviction on charges brought by the same district

attorney's office, and had indicated in his responses to voir dire questions that he had a negative view of law enforcement.

¶ 38　Howard-Walker attempted to rebut the prosecutor's race-neutral explanation for the strike, asserting that the prosecutor's peremptory strikes had shown a pattern of excusing "minorities" and that white jurors who had disclosed similar experiences and views regarding the police had not been stricken. The trial court denied the *Batson* challenge, noting that the prospective juror "was quite reluctant and critical of law enforcement generally."

¶ 39　While it is true that a white juror said on his jury questionnaire that he had had a particularly bad experience with the police, his answers to questions during voir dire revealed that his experiences were significantly different from that of the challenged male Hispanic juror. The white juror was a firefighter. He said that he did not have "a high impression" of the police because they often "butted heads" at work. He then clarified that he only had a bad impression of state patrol officers (as opposed to other police officers) during traffic stops, and that he could put his

negative perceptions aside. The state patrol was not involved in Howard-Walker's case.

¶ 40 The dismissed male Hispanic juror also said that he felt some police officers are "bad apples" and that he felt his liberties were "on the line" because, generally speaking, the police were becoming "a little militia with a private army." There was no rehabilitative questioning either by the court or defense counsel that would demonstrate that the juror could set aside his negative impressions of the police.

¶ 41 As we did with respect to the female Hispanic juror, we reject Howard-Walker's argument that the trial court erred in considering that the male Hispanic juror was not of the same race as Howard-Walker. Though the court noted that the male Hispanic juror and Howard-Walker's ethnicities were not the same, it nevertheless denied the *Batson* challenge based on the juror's criticisms of law enforcement.

¶ 42 For these reasons, we conclude that the trial court's step three *Batson* findings are supported by the record, and we reject Howard-Walker's claims to the contrary.

### III. Allegedly Improper Police Testimony[2]

¶ 43    Howard-Walker next argues that the admission of several portions of Detective Garcia's testimony constituted reversible error.

### A. Standard of Review

¶ 44    We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). "[W]e review nonconstitutional trial errors that were preserved by objection for harmless error." *Hagos v. People*, 2012 CO 63, ¶ 12. Under this standard, we reverse only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

---

[2] We observe that the defendant's selection of small portions of two long days of trial testimony has an effect on the reader that is quite different than the effect when reading the entire trial transcript. When read in its entirety, the trial transcript portrays an engaged trial court. None of the testimony objected to for the first time on appeal was set off by any particular circumstances from the rest of the non-objected testimony. It is very easy for an appellate court to read a cold transcript and conclude that certain unobjected testimony should not have been admitted. The trial court might well come to the same conclusion if the court had the luxury of reading a transcript. But that luxury is not available to the trial court and that is one good reason why the standard for plain error is so high.

¶ 45    When a defendant fails to object to the admission of evidence at trial, we will not reverse in the absence of plain error. *People v. Vecellio*, 2012 COA 40, ¶ 54. "Under the plain error standard, the defendant bears the burden to establish that an error occurred, and that at the time the error arose, it was so clear cut and so obvious that a trial judge should have been able to avoid it without benefit of objection." *People v. Conyac*, 2014 COA 8M, ¶ 54. Reversal is required if the error was so grave that it "undermined the fundamental fairness of the trial itself" so as to "cast serious doubt on the reliability of the conviction." *Id.*

### B. Testimony that the Handgun in the Surveillance Video Was "Real"

¶ 46    The prosecutor did not qualify Detective Garcia as an expert witness. Therefore, his opinion testimony was limited to his rationally based perceptions that were helpful to the jury in understanding the testimony or determining a fact in issue. CRE 701; *Venalonzo v. People*, 2017 CO 9, ¶ 18.

¶ 47    After the surveillance video was played for the jury, which, as noted above, showed one of the perpetrators holding what appeared to be a handgun, the prosecutor asked Detective Garcia, "How can

20

you tell that's a real handgun?" Detective Garcia answered, without objection by Howard-Walker, as follows:

> Well, one of the things that would make it real is a size of the barrel. It's a large barrel. Air soft guns [sic] their muzzles have a red tip and small barrel for the little air soft pellet to come out. This is an open barrel. That's a large barrel for a large projectile to exit the weapon.

¶ 48   Howard-Walker argues that this was improper expert testimony offered in the guise of lay opinion. We agree, but also conclude that, under the circumstances, this testimony did not constitute plain error.

¶ 49   CRE 701 governs admissibility of lay testimony. It provides that

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) *not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.*

(Emphasis added.)

¶ 50   In a series of cases decided after Howard-Walker's trial, the Colorado Supreme Court clarified the standard that distinguishes

21

lay testimony from expert testimony. *Marsh v. People*, 2017 CO 10M; *Venalonzo*, ¶¶ 17-25; *People v. Ramos*, 2017 CO 6.

> If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony. If, on the other hand, the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony.

*Venalonzo*, ¶ 2.

¶ 51    As the *Venalonzo* court itself recognized, the line between lay and expert testimony may be difficult to discern. *Id.* at ¶ 24. This is particularly the case when the witness is a police officer. *Stewart*, 55 P.3d at 123. While police officers may offer testimony based on their perceptions and experiences, officer lay testimony is objectionable when it requires the application of or reliance on specialized skills or training. *Venalonzo*, ¶ 19.

¶ 52    In *Stewart*, in analysis that was not displaced by *Venalonzo*, the supreme court held that while it was appropriate for an officer to give lay testimony about his observations of an accident scene, his testimony crossed the expert line when he essentially reconstructed the accident by deducing matters such as the

22

vehicle's direction, position, and speed. 55 P.3d at 124. Similarly, in *People v. Veren*, 140 P.3d 131, 139-40 (Colo. App. 2005), cited favorably by *Venalonzo*, a division of this court concluded that while an ordinary citizen might know that Sudafed contains an ingredient that can be used to manufacture methamphetamine, the lay witness officer's testimony that he suspected the defendant was manufacturing based on the amount of Sudafed in his possession constituted expert testimony because an ordinary citizen would probably not know how much Sudafed would be required for that purpose. And in *Ramos*, ¶ 9, decided together with *Venalonzo*, the supreme court held that an ordinary citizen could not be expected to differentiate between "blood cast-off" and "blood transfer."

¶ 53 Applying *Venalonzo*, we strongly doubt that ordinary citizens can determine whether a gun depicted in a video was real or fake. *See also People v. Romero*, 2017 CO 37, ¶ 15. To do so requires expertise beyond the ken of the ordinary citizen, and such testimony constituted expert testimony under CRE 702.

¶ 54 While this evidence was improperly admitted as lay opinion evidence, admitting it was not plain error, for two reasons. First, the latest supreme court formulation of the distinction between lay

23

and expert testimony was not decided until more than a year after Howard-Walker's trial.

¶ 55   More importantly, no Colorado case has directly addressed the distinction between lay and expert testimony with respect to whether a gun depicted in a video is real or fake. "Ordinarily, for an error to be obvious, the action challenged on appeal must contravene a clear statutory command, a well-settled legal principle, or Colorado case law." *People v. Manyik*, 2016 COA 42, ¶ 36. It necessarily follows that any error in the admission of this brief testimony was not obvious and thus was not plain error.

## C.  The Detective's Testimony that the Perpetrator Would Have Used the Gun if He Had Encountered the Homeowner

¶ 56   The prosecutor asked Detective Garcia, "How is that particular handgun being used during the burglary?" Detective Garcia answered that "[the gun] was being used in a manner that if someone was to walk in on the individuals during the burglary or be confronted by the police, they were ready to engage." Howard-Walker objected on the basis that peering into the mind of the perpetrator regarding an event that never occurred was nothing more than speculation, but the trial court overruled the objection.

¶ 57    Detective Garcia continued, saying:

> [The gun] is being openly displayed with the
> hand and the finger on the trigger ready to be
> utilized.  Individuals going through the room
> with the gun out in a manner to me the way I
> see it is as a threatening manner whether to
> engage if a homeowner or engage by officers
> that that person is ready [sic].  If he did not
> intend it, I don't believe the weapon would be
> presented in that manner, scanning the room
> as he is doing so as in the video.

¶ 58    Howard-Walker argues that this testimony was inadmissible because Detective Garcia had no personal knowledge about what the person in the video would have done with the gun had he encountered the homeowner and thus he was improperly speculating.  We agree.

¶ 59    "A lay witness may state an opinion about another person's motivation or intent only if the witness had sufficient opportunity to observe the person and to draw a rational conclusion about the person's state of mind." *People v. Jones*, 907 P.2d 667, 669 (Colo. App. 1995).  An opinion not based on personal knowledge is speculative and therefore inadmissible.  *Id.*  Detective Garcia was not present during the burglary.  And while he did view the video, it is at least questionable how the video could inform a person's

rational conclusion about what the perpetrator would have done had he encountered the homeowner or the police.

¶ 60    Moreover, even if Detective Garcia had an adequate foundation for this testimony, it likely should have been excluded both under principles of relevancy and under CRE 403. What might have happened was not an element of the offense; the relevant element of the offense was the use of a deadly weapon in the course of the burglary, which (if the gun was real) the video amply displayed. It was immaterial whether the perpetrator might have committed an additional crime had he encountered the homeowner or the police.

¶ 61    Even so, we conclude on this record that any error was harmless. If the jury believed that the gun would have been used had the perpetrators encountered the homeowner or the police, that belief could have prejudiced the jurors against Howard-Walker. But the jury could have drawn this inference for itself (still another reason why the testimony should not have been admitted); the fact that Detective Garcia testified about such an immaterial (but easily drawn) inference did not, in our view, "substantially influence[] the verdict or affect[] the fairness of the trial proceedings." *Hagos*, ¶ 12 (quoting *Tevlin*, 715 P.2d at 342).

26

## D. The Detective's Identification of Howard-Walker in the Video

¶ 62    Detective Garcia testified, without objection, that he was "one hundred percent" certain that he recognized Howard-Walker as one of the perpetrators in the video.

¶ 63    Howard-Walker argues that because Detective Garcia testified that his "time and experience on the Police Department" helped him to make this identification, his identification of Howard-Walker was improper expert testimony. He also argues that the identification invaded the province of the jury and was substantially more prejudicial than probative. Following precedents from the supreme court and other divisions of this court, we reject these arguments.

¶ 64    A lay witness may testify regarding the identity of a person depicted in a surveillance photograph (or, for that matter, a video), "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the [video] than is the jury." *Robinson v. People*, 927 P.2d 381, 382 (Colo. 1996). That is the case here.

¶ 65    Though Garcia's contact with Howard-Walker came after he had seen the video (a fact that is not relevant under *Robinson*), he nevertheless was in a better position than the jury to identify

Howard-Walker as one of the perpetrators in the video because he had had close, face-to-face contact with him during the police interview. What's more, while Howard-Walker was clean-shaven during the trial, he, like the perpetrator in the video, had facial hair during the police interview, making Detective Garcia's testimony that much more helpful to the jury. Any allegation (which is not made explicitly by Howard-Walker) that Detective Garcia's perception was somehow tainted by the fact that he only met Howard-Walker after viewing the video goes to the weight of his testimony, not its admissibility. No specialized knowledge is required to recognize an individual in a video.

¶ 66    This evidence was obviously probative of a material fact — indeed, the critical fact at issue. Merely because Detective Garcia's testimony may have been detrimental to Howard-Walker did not render that testimony unfairly prejudicial. *Kelly v. Haralampopoulos by Haralampopoulos*, 2014 CO 46, ¶ 47. And it did not "invade the province of the jury," *Davis v. People*, 2013 CO 57, ¶ 27, a contention that was rejected dispositively by *Robinson*. Accordingly, we discern no error, much less plain error, in the admission of this testimony.

## E. The Detective's Testimony Regarding Probable Cause

¶ 67 The prosecutor asked Detective Garcia to describe his investigation. In a lengthy, narrative response, the detective testified that he wrote the search warrant for Howard-Walker's apartment, had it reviewed by his supervisor, and "once [the supervisor] said there was probable cause, took the warrant to [a judge] for review." Though Howard-Walker did not object to this testimony, he nevertheless argues on appeal that the trial court should have stepped in, sua sponte, and prohibited the testimony.

¶ 68 When probable cause to search or arrest is not at issue, "it is improper to present to the jury evidence about obtaining an arrest or search warrant." *People v. Mullins*, 104 P.3d 299, 301 (Colo. App. 2004). This is so because whether the police believed and a judge found that there was probable cause to arrest a defendant is, under most circumstances, irrelevant to determining whether the prosecution proved the commission of a crime beyond a reasonable doubt. *Id.*; *see* CRE 401. We agree with Howard-Walker that probable cause was not at issue in this case and this evidence should not have been admitted.

¶ 69    Under some circumstances, police officers may testify about why they took certain investigative steps, even when this testimony "touches upon prohibited subjects." *People v. Penn*, 2016 CO 32, ¶ 32. For instance, in *Casias v. People*, 160 Colo. 152, 162, 415 P.2d 344, 349 (1966), *superseded by statute on other grounds as stated in People v. Ceja*, 904 P.2d 1308 (Colo. 1995), the supreme court held it was not error for a detective to testify that he arrested the defendant on the "strength of the warrant" because that testimony was relevant to the prosecutor's explanation of the circumstances of the arrest. But in this case, Detective Garcia did not need to describe the search and arrest warrants process to explain the investigation; thus, his testimony on those matters should not have been admitted.

¶ 70    However, because under some circumstances testimony regarding probable cause is admissible, and because Detective Garcia's reference to probable cause was fleeting, we cannot conclude that the error was obvious. Therefore, there was no plain error. *People v. Renfro*, 117 P.3d 43, 48 (Colo. App. 2004).

### F. Testimony Regarding the Girlfriend's Reaction to Identifying Howard-Walker

¶ 71 Detective Garcia testified that when he interviewed Howard-Walker's girlfriend, she said that she was "eighty percent" certain that she recognized Howard-Walker in the stills of the surveillance video. He further testified that she "was getting emotional" and "really began crying," observations that were perfectly appropriate for a lay witness to express. CRE 701; *People v. Hulsing*, 825 P.2d 1027, 1032 (Colo. App. 1991). But then the prosecutor asked Detective Garcia *why* he thought the girlfriend was "getting emotional," an inquiry into the girlfriend's state of mind that the detective was neither competent to undertake or to give testimony about. He answered that it was because "[s]he recognized her boyfriend in the photos." As with almost all of the testimony relied on for reversal, Howard-Walker did not object.

¶ 72 Howard-Walker asserts that this testimony was improper because Detective Garcia had no personal knowledge, as required by CRE 602, to know what the girlfriend was thinking when she started "getting emotional" and was crying. We conclude that the

admission of this evidence was erroneous, but did not constitute plain error.

¶ 73    Questions regarding the girlfriend's initial identification of Howard-Walker from the surveillance video, and the reliability of that identification, were fully explored during the trial, and the jury had extensive information to make its judgment on that issue. Moreover, the jury was just as able as the officer to decide why the girlfriend was crying (again, another reason why this evidence should not have been admitted).  Given this, we cannot conclude that the brief testimony by the officer in this respect was obviously improper or "undermine[d] the fundamental fairness of the trial." *Conyac*, ¶ 54.

G.  The Detective's Testimony Regarding Howard-Walker's Statement About Possibly Identifying the Other Perpetrator

¶ 74    Detective Garcia testified that when he interviewed Howard-Walker about the burglary, Howard-Walker asked him, "[w]hat would it get me if I told you the name of the other person [in the video]?"  The prosecutor asked the detective what he thought that statement meant, and he answered, without objection, "[t]hat

32

[Howard-Walker] was involved and knows who the other person was that committed the burglary."

¶ 75    Howard-Walker argues that this testimony was improper because it constituted an impermissible opinion on his guilt.  A witness may not testify that he believes that the defendant committed the crime at issue.  *Penn*, ¶ 31.

¶ 76    But the officer did not testify that Howard-Walker was guilty; he only testified what he thought Howard-Walker's statement meant.  The inference that may be drawn from Howard-Walker's statement is obvious to any reasonably intelligent person, so even if the officer's testimony was improper, it did not undermine the fundamental fairness of the trial.  *Conyac*, ¶ 54.

   H.  Testimony About Whether Howard-Walker was Being Truthful

¶ 77    The prosecutor asked Detective Garcia whether he felt that Howard-Walker was "forthcoming" or "truthful" during the police interview.  Detective Garcia answered "no" to both questions.  Howard-Walker did not object to this testimony.

¶ 78    It is improper to ask one witness to opine on the truthfulness of another.  *Liggett v. People*, 135 P.3d 725, 733 (Colo. 2006).  Though a detective may testify about his assessment of an

33

interviewee's credibility when that testimony is offered to provide context for the detective's interrogation tactics and investigative decisions, *Davis*, ¶ 17, Detective Garcia's testimony was not offered for those purposes and was therefore improper.

¶ 79 But that error does not rise to the level of plain error. As in *Liggett*, 135 P.3d at 734, there was ample evidence before the jury to support Howard-Walker's convictions without relying on Detective Garcia's improper testimony. Multiple witnesses identified Howard-Walker as one of the men in the video, Howard-Walker's shoes were consistent with the footprints found near the broken window of the victim's home, and the jury was entitled to determine that Howard-Walker's offer to give up the name of the other suspect meant that he was involved in the crime. Thus, Howard-Walker has not shown that that testimony undermined the fundamental fairness of the trial. *Id.* at 734-35; *Conyac*, ¶ 54.

## IV. Prosecutorial Misconduct

¶ 80 Howard-Walker next asserts that the prosecutor engaged in three instances of reversible misconduct.

¶ 81    We engage in a two-step analysis to review claims of

prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096

(Colo. 2010).  First, we determine whether the prosecutor's conduct

was improper based on the totality of the circumstances.  *Id.*

Second, we decide whether any misconduct warrants reversal

according to the proper standard of review.  *Id.*

¶ 82    Because Howard-Walker did not object to any of the

prosecutor's statements, we review for plain error.  *Id.* at 1097.

### A.  Confronting the Girlfriend About Perjury

¶ 83    The girlfriend testified that she did not remember telling

Detective Garcia that she had recognized Howard-Walker in the

video.  She and the prosecutor then engaged in the following

colloquy:

> Q.  All right.  Now, you understand that today
> you have been sworn in under oath, right?
>
> A.  Right.
>
> Q.  And you understand how perjury works,
> right?
>
> A.  Right.
>
> Q.  You realize you have been sworn to tell the
> truth, the whole truth, and nothing but the
> truth?

A. Yes, I do.

Q. And you understand that perjury is not telling the truth in court?

A. Right.

Q. And so it's your testimony today that you did not identify anyone from that videotape?

A. Right, no.

¶ 84    "A prosecutor's statement or question indicating his belief that a witness committed perjury is improper." *People v. Romero*, 2015 COA 7, ¶ 37. But even if the prosecutor stepped over the permissible line in repeatedly suggesting that the girlfriend was committing perjury, because the prosecutor did not threaten, coerce, or otherwise "drive[] [her] 'off the stand,'" any such misconduct was not reversible. *Id.* (quoting *Webb v. Texas*, 409 U.S. 95, 95-98 (1972)).

¶ 85    As in *Romero*, ¶ 40, the prosecutor's statements were brief and did not silence the witness or alter the girlfriend's testimony; she continued to answer the prosecutor's questions, and, at least at first, continued to assert that she had never identified Howard-Walker in the video stills. The girlfriend later, in response to a different line of questioning, changed her testimony by saying

36

that she had told Detective Garcia that she had recognized Howard-Walker. But even then, she asserted that she only did so because Detective Garcia had allegedly pressured or intimidated her. Thus, as in *Romero*, ¶ 40, the girlfriend's testimony "was virtually the same before and after the prosecutor's references to perjury." Under these circumstances, any error did not amount to plain error.

## B. Prosecutor's Comment on the Girlfriend's Truthfulness

¶ 86     In closing argument, the prosecutor said that the girlfriend "was not forthcoming," "was not being honest," and was "not a credible witness."

¶ 87     A prosecutor is permitted to comment on the evidence, including the reasons why the jury should believe or not believe a particular witness, as long as the prosecutor does not go so far as to call that witness a "liar." *Domingo-Gomez v. People*, 125 P.3d 1043, 1050 (Colo. 2005). Indeed, drawing reasonable inferences from the evidence regarding the credibility of witnesses is one of the fundamental purposes of closing argument. *Id.* at 1048-50. These statements did exactly that and were not improper.

¶ 88    As the prosecutor pointed out in closing argument, the girlfriend's testimony conflicted with that of Detective Garcia. Indeed, the girlfriend gave inconsistent testimony at trial — at first she claimed that she had never told Detective Garcia that she had identified Howard-Walker in the video stills, and then, after some probing, said that she had in fact identified Howard-Walker. The prosecutor fairly characterized this testimony as confusing and "all over the place." Like in *Domingo-Gomez, id.* at 1051, the evidence supported a reasonable inference that the girlfriend's testimony was false, and thus the prosecutor's comments were proper.

C.  Reference to Howard-Walker's Decision Not to Testify

¶ 89    The Fifth Amendment forbids comment by the prosecution on the accused's decision not to testify. *Griffin v. California*, 380 U.S. 609, 615 (1965). An impermissible comment is one that "in context, was calculated or intended to direct the attention of the jury to the defendant's neglect or failure to exercise his right to testify in his own behalf." *Martinez v. People*, 162 Colo. 195, 200, 425 P.2d 299, 302 (1967).

¶ 90    We agree that the prosecutor stepped over the line when he told the jury in closing argument that the only person who knew the

location of the fruits of the burglary was Howard-Walker and "he won't [testify]." We view this statement as a reference to Howard-Walker's decision not to testify. U.S. Const. amend. V; Colo. Const. art. II, § 18; *People v. Todd,* 189 Colo. 117, 121, 538 P.2d 433, 436 (1975).

¶ 91    Had Howard-Walker objected to this testimony, and had it been admitted over objection, we would review for constitutional harmless error, but no objection was made and thus we review for plain error. *People v. Miller,* 113 P.3d 743, 749 (Colo. 2005). Under this standard, only prosecutorial misconduct which is "flagrantly, glaringly, or tremendously improper" warrants reversal. *Domingo-Gomez,* 125 P.3d at 1053.

¶ 92    While we do not condone the prosecutor's comment, we nevertheless conclude that the comment did not amount to plain error, for two reasons.

¶ 93    First, the comment was a single, minimal reference. *See People v. Travis,* 192 Colo. 169, 171, 558 P.2d 579, 580-81 (1976); *People v. Gilkey,* 181 Colo. 103, 106, 507 P.2d 855, 857 (1973); *People v. Petschow,* 119 P.3d 495, 505-06 (Colo. App. 2004).

¶ 94    Second, the jury was correctly instructed, several times, that

Howard-Walker had an absolute right not to testify and that no

adverse inference from his exercise of that right was permissible.

*People v. Garcia*, 2012 COA 79, ¶ 20 (we presume that the jury

followed the court's instructions, absent evidence to the contrary)

(citing *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1088 (Colo.

2011)); *see also State v. Escalante-Orozco*, 386 P.3d 798, 826 (Ariz.

2017).  There is no suggestion in the record that the jury did not

heed this instruction.

¶ 95    We therefore conclude that the prosecutor's statement was not

"flagrantly, glaringly, or tremendously improper," *Domingo-Gomez*,

125 P.3d at 1053, and did not fundamentally undermine the

fairness of the trial, *Conyac*, ¶ 54.

V.  Adequacy of the Jury Instructions

¶ 96    Howard-Walker next argues that the trial court erred when it

failed to instruct the jury on the predicate crime of theft, and when

it failed to define the word "intent."  The parties agree and we

concur that the jury instructions were deficient because they failed

to instruct on the elements of theft, but we nevertheless conclude

that the error was not reversible.

¶ 97    "We review jury instructions de novo to determine whether [they] as a whole accurately informed the jury of the governing law." *People v. Ridgeway*, 2013 COA 17, ¶ 12 (citation omitted).  When, as in this case, no objection is made to the jury instructions, we reverse only for plain error.  *Id.* at ¶ 9.  As noted, "[p]lain error occurs when, after a review of the entire record, the appellate court can say with fair assurance that the error so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction."  *Bogdanov v. People*, 941 P.2d 247, 255 (Colo.), *amended*, 955 P.2d 997 (Colo. 1997).

¶ 98    The United States and Colorado Constitutions require the prosecution to prove every element of the charged offense beyond a reasonable doubt.  *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001); *see* U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; Colo. Const. art. II, § 16; Colo. Const. art. II, § 23; Colo. Const. art. II, § 25.  "To preserve this constitutional right, a trial court must properly instruct the jury on every element of a crime."  *Ridgeway*, ¶ 12.

A.  The Elements of Burglary and the Predicate Crime of Theft

¶ 99    The elements of burglary with a deadly weapon are as follows:

- the defendant;

- knowingly entered unlawfully, or remained unlawfully after a lawful or unlawful entry;

- in a building or occupied structure;

- with intent to commit therein a crime, other than trespass;

- against another person or property; and

- the defendant used a deadly weapon or possessed and threatened the use of a deadly weapon in effecting the burglary.

§ 18-4-202(1).

¶ 100    The trial court must instruct on both the elements of burglary, as well as the elements of the underlying crime (in this case, theft). *People v. Palmer*, 87 P.3d 137, 140 (Colo. App. 2003). Howard-Walker did not object to the instruction; indeed, his counsel approved it.[3]  When the elemental instructional error

---

[3] Because Howard-Walker's counsel affirmatively approved the jury instructions, there is an argument that Howard-Walker waived any instructional error.  *See United States v. Olano*, 507 U.S. 725, 733 (1993); *People v. Rediger*, 2015 COA 26, ¶ 64 (*cert. granted* Feb. 16, 2016).  The Attorney General does not argue that Howard-Walker waived the instructional error.  Because we conclude for other

42

relates to an element that is not contested at trial, the failure to instruct is not plain error. *People v. Cowden*, 735 P.2d 199, 202 (Colo. 1987).

¶ 101    In *Cowden*, the defendant was charged with six counts of felony theft. *Id.* at 200. The trial court failed to instruct the jury that it must find that the value of the stolen property was between $200 and $10,000, one of the elements of the theft charge. *Id.* at 201. The supreme court held that, at least as to five of the theft counts, because the prosecution presented uncontested evidence that the value of the allegedly stolen items was more than $200, the deficiency in the instructions did not require reversal.

¶ 102    Similarly, in *People v. Fichtner*, 869 P.2d 539, 541 (Colo. 1994), the supreme court held that the trial court's failure to define "serious bodily injury" in the jury instruction on menacing with a deadly weapon, although erroneous, was not plain error. In that case, the prosecution presented uncontested evidence that the defendant had threatened the victim with an axe handle. *Id.* His defense was that he was only using the axe handle to defend his

---

reasons that the deficient instructions do not require reversal, we do not address whether Howard-Walker waived the error.

43

property; he never contested the victim's assertion that she had feared that she was in imminent danger of suffering serious bodily injury. *Id.* at 544. Accordingly, the court concluded that because whether the defendant had placed the victim in fear of imminent serious bodily injury was not at issue in the case, the trial court's instructional error did not constitute plain error. *Id.*

¶ 103   We agree with both parties that the trial court failed to properly instruct the jury on the elements of burglary. The jury was instructed to find Howard-Walker guilty if it found that he entered the victim's home "with intent to commit therein a crime, other than trespass," but the instructions did not identify the underlying crime or define its elements. Howard-Walker argues that this deficiency meant that the jury could have convicted him for his intent to commit any crime, without unanimously agreeing that he intended to commit any particular crime. We reject this argument.

¶ 104   The complaint and information alleged that Howard-Walker broke into the victim's home and committed theft. The jury viewed the surveillance video, which depicted a person (whom several witnesses identified as Howard-Walker) stealing the contents of the victim's safe. Howard-Walker never argued that the crime captured

by the surveillance video was any crime other than theft, nor did he assert that a crime did not occur; his only defense was that he did not commit the crime. Under these facts, we cannot discern what underlying crime could have been committed, other than theft.

¶ 105 Moreover, during both opening statement and closing argument the prosecutor asserted that Howard-Walker broke into the victim's home with the intent to commit theft. The record demonstrates that the specification of the underlying crime was not a controverted element of the burglary offense; therefore, the court's failure to instruct the jury on theft was not plain error. *Cowden*, 735 P.2d at 203.

## B. Intent

¶ 106 For similar reasons, we reject Howard-Walker's argument that the court's failure to define the word "intent" was plain error.

¶ 107 The culpable mental state "intent" is an element both of burglary and conspiracy to commit burglary. §§ 18-2-201, 18-4-202. As such, it must have been "established with the same certainty as any other material element of the crime[s]." *Palmer v. People*, 964 P.2d 524, 527 (Colo. 1998). Thus, to convict a defendant of burglary and conspiracy to commit burglary, the jury

45

must conclude beyond a reasonable doubt that the defendant's "conscious objective [was] to cause the specific result proscribed by the statute[s] defining the offense[s]." § 18-1-501(5), C.R.S. 2016. Because the word "intent" carries a "technical or particular meaning," its definition must be presented to the jury. *Griego*, 19 P.3d at 7 (citation omitted).

¶ 108 In this case, the trial court's failure to provide the definition of "intent" to the jury was error. But Howard-Walker did not challenge whether the evidence showed that the person in the video acted "with intent." When a person is seen on a surveillance video seizing items that do not belong to him, it is not a leap of faith to infer that he intended to take the victim's property. Indeed, Howard-Walker's only defense was that it was not he, but some other person, who was depicted taking the victim's property in the video. He never argued or suggested that the person depicted in the video did not intend to dispossess the lawful owner of the seized property. Under these circumstances, the trial court's failure to define the culpable mental state did not constitute plain error. *Fichtner*, 869 P.2d at 544.

## VI. Cumulative Error

¶ 109    Finally, Howard-Walker argues that the cumulative effect of the trial court's errors and prosecutorial misconduct violated his right to a fair trial.  Although we have identified several evidentiary errors (none of which, considered by themselves, requires reversal), one instance of prosecutorial misconduct, and two instructional errors, we ultimately conclude that these errors, viewed cumulatively, did not substantially prejudice Howard-Walker's right to a fair trial.  *People v. Munsey*, 232 P.3d 113, 124 (Colo. App. 2009).

¶ 110    As an initial matter, we note that we have identified both one preserved error (reviewed for harmless error) and several unpreserved errors (reviewed for plain error).  The preserved error was the detective's testimony about what Howard-Walker would have done had he encountered the homeowner (or anyone else) during the burglary.  The unpreserved errors were the deficient jury instructions; portions of the detective's testimony (that the gun was real, that a judge had determined that there was probable cause to search Howard-Walker's apartment, why the girlfriend cried during the police interview, and whether Howard-Walker was being

47

"truthful" during the police interview); and one instance of prosecutorial misconduct.

¶ 111   In view of our finding both preserved and unpreserved errors, we follow the Tenth Circuit's protocol in *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008), to determine whether there was cumulative error warranting reversal.  There, the Tenth Circuit held as follows:

> First, the preserved errors should be considered as a group under harmless-error review.  If, cumulatively, they are not harmless, reversal is required.  If, however, they are cumulatively harmless, the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error.  In other words, the prejudice from the unpreserved error is examined in light of any preserved error that may have occurred.

*Id.*  Because we have identified only one preserved error, and have determined that the error was harmless, we proceed to the next step to determine whether the combined effect of all of the errors constituted plain error.

¶ 112   To resolve whether there was cumulative error, we must determine whether "[n]umerous formal irregularities . . . in the

aggregate show the absence of a fair trial." *Munsey*, 232 P.3d at 124 (quoting *Oaks v. People*, 150 Colo. 64, 66-67, 371 P.2d 443, 446 (1962)).

¶ 113 Few Colorado cases provide meaningful guidance as to when multiple errors rise to the level of reversible cumulative error. *See, e.g., People v. Roy*, 723 P.2d 1345 (Colo. 1986); *People v. Scheidt*, 182 Colo. 374, 385, 513 P.2d 446, 452 (1973); *People v. Reynolds*, 194 Colo. 543, 575 P.2d 1286 (Colo. 1978); *Oaks*, 150 Colo. at 66-67, 371 P.2d at 446.

¶ 114 Some guidance is provided by federal cases. A court evaluates whether the total effect of errors warrants reversal based on a number of non-exclusive factors, including: the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy of any remedial efforts); the strength of the government's case; and the length of the trial. *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005), *abrogated in part and on other grounds as recognized by United States v. Charlestain*, 662 F. App'x 691, 692 (11th Cir. 2016).

¶ 115  In *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011), the Ninth Circuit recognized that habeas corpus relief may be granted when the otherwise harmless errors "amplify each other in relation to a key contested issue in the case." The court determined that because the defendant's claimed errors did not have a "synergistic effect," the combined effect of which might "infect the trial with unfairness," he was not entitled to habeas corpus relief. *Id.*

¶ 116  In this case, even the most serious error — the improper comment on Howard-Walker's exercise of his right against self-incrimination — was fleeting, and the less serious errors bore little relation to each other. Whether the gun in the video was "real" was unrelated to the critical issue in the case, which was whether Howard-Walker was one of the perpetrators of the burglary. The same is true of the erroneous jury instructions and Detective Garcia's testimony about how Howard-Walker might have used the gun had he encountered the homeowner or the police.

¶ 117  Detective Garcia's testimony about probable cause, that he did not believe Howard-Walker was being "truthful" during the police interview, and that the girlfriend was upset because she had recognized Howard-Walker in the video stills may have tended to

undermine Howard-Walker's misidentification defense. But each of these references was brief. Howard-Walker's failure to object to any of these errors is one indication that, in context, his trial counsel did not consider the now-objected-to testimony to be seriously prejudicial to Howard-Walker. *People v. Rodriguez*, 794 P.2d 965, 972 (Colo. 1990) ("The lack of an objection may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging.") (citation omitted).

¶ 118 Even when considered cumulatively, these errors were relatively small events scattered over the course of a two-day trial, during which substantial evidence was presented — including Howard-Walker's question to Detective Garcia about what it would get him if he gave up the name of the other perpetrator — from which the jury reasonably could have concluded that Howard-Walker was the man with the gun. *See Miller*, 113 P.3d at 751 (Colo. 2005) (finding no plain error in light of overwhelming evidence of the defendant's guilt).

¶ 119 Because Howard-Walker received a fair trial in spite of the identified errors, we conclude that a new trial is not warranted.

## VII.  Conclusion

¶ 120    The judgment of conviction is affirmed.

JUDGE DAILEY and JUDGE J. JONES concur.