COLORADO COURT OF APPEALS                    2017COA107

Court of Appeals No. 15CA0699
El Paso County District Court No. 13CR3832
Honorable Thomas K. Kane, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Lawson P. Garrison,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE WEBB
Booras and Freyre, JJ., concur

Announced August 10, 2017

Cynthia H. Coffman, Attorney General, Ellen M. Neel, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Cynthia A. Harvey, Alternate Defense Counsel, Castle Rock, Colorado, for
Defendant-Appellant

¶ 1     The common knowledge and experience of an ordinary person have become one marker of the boundary separating lay from expert testimony.  This case involves lay witness testimony about e-mail.  So, one might wonder whether this ubiquitous person would be aware that

- the record of each e-mail transmission includes an Internet Protocol (IP) address from which the transmission initiated;

- the IP address can be linked to an Internet service provider (ISP); and

- in turn, the ISP can often trace the IP address to the physical address of a particular ISP customer?

¶ 2     Despite the dramatic increase in use of e-mail, we join the few jurisdictions to have addressed this question and conclude that such a person would not be aware of these facts, at least in the combination used by the prosecution to explain how the investigation began with charges against the victim, but led to evidence of criminal acts by defendant, Lawson P. Garrison.  And because this information was the glue that held much of the prosecution's case against Garrison together, he is entitled to a new trial on the charges of first degree perjury, attempt to influence a

public servant (three counts), and conspiracy to attempt to influence a public servant.

¶ 3      Turning to Garrison's second issue, the trial court did not abuse its considerable discretion in denying him a continuance of the trial. And because the charges of possessing a defaced firearm and felony menacing were unrelated to IP addresses, his conviction by a jury on those charges stands affirmed.

## I. Facts and Procedural Background

¶ 4      According to the prosecution's evidence bearing on the two issues raised on appeal,[1] Garrison had an affair with the victim's wife. After the affair ended, Garrison and his wife set up through Google a Gmail account in the victim's name. Using that account, they began sending themselves derogatory and threatening e-mails.

¶ 5      Based on these e-mails, Garrison and his wife made several police reports against the victim and provided related documents to the police. They sought a protection order against the victim and testified about the e-mails at the hearing. The police filed charges against the victim.

---

[1] The Attorney General concedes that both the improper expert testimony and continuance issues were preserved.

¶ 6    Seeking evidence to support these charges, the police obtained a subpoena concerning the Gmail account.  In response, Google identified two IP addresses.  The police associated these addresses with two ISPs.  After being subpoenaed, the ISPs identified one IP address as the home of Garrison's wife, where Garrison lived at the time, and the other as her employer.  When interviewed by police, both Garrison and his wife denied having set up the account.

¶ 7    Even so, all charges against the victim were dropped, the investigation focused on the Garrisons, and they were charged.  Garrison's wife pleaded guilty to several charges.  Garrison elected to go to trial but he did not testify.  His theory of defense was that the victim had hacked into his home computer and the server at his wife's workplace, changing the IP addresses used to access the Gmail account.  This process is called "spoofing."

## II. The Trial Court Did Not Abuse Its Discretion in Refusing to Grant Garrison a Continuance

¶ 8    If the trial court erred in denying Garrison a continuance and he could show prejudice, he would be entitled to a new trial on all charges.  So, we begin with this contention.

3

¶ 9    On the first day of trial — March 3, 2015 — defense counsel renewed her motion for a continuance that she had made at the trial readiness conference four weeks earlier.  She conceded that Garrison "d[id] not want a continuance," but argued that she was not prepared for trial because the case required "specialized computer knowledge," she did not "get approval for [an] expert until January 30th," and she had "only met with [the expert] one time."

¶ 10    The prosecutor opposed the continuance for the following reasons:

> This is one more delay causing one more
> frustration and anxiety from the victims, from
> the police officers that I have spent the last,
> you know, two weeks scheduling and going
> though all the reports.  Again over a thousand
> pages of reports and discovery.  This is the
> second time, well, that I prepped for this trial
> in its entirety.

As to Garrison's expert witness, the prosecutor argued that he had "in my receipt what the expert is going to testify to so apparently he's prepared to testify."

¶ 11    The trial court denied the motion.  The court explained that "[t]he procedural history of this case includes a lot of motions to continue" and the "risk of prejudice that has been argued by

4

[defense counsel] can be managed by the court." Specifically, the court said that Garrison's expert would be allowed to testify even though he had not been timely endorsed.

## A. Standard of Review and Law

¶ 12     A trial court's denial of a motion for a continuance is reviewed for an abuse of discretion. *People v. Faussett*, 2016 COA 94M, ¶ 12. "A trial court abuses its discretion in denying a motion to continue if, under the totality of the circumstances, its ruling is manifestly arbitrary, unreasonable, or unfair." *Id.* (citation omitted).

¶ 13     "No mechanical test exists for determining whether the denial of a request for a continuance constitutes an abuse of discretion." *Id.* (citation omitted). Rather, "the answer must be found within the circumstances of each case, particularly in the reasons presented to the trial judge at the time of the request." *People v. Roybal*, 55 P.3d 144, 150 (Colo. App. 2001).

## B. Analysis

¶ 14     Garrison first argues that the trial court should have granted a continuance because his new trial counsel "inherited the case just two months prior and was running an entirely different defense than the prior public defender." But Garrison fails to explain why

5

the "different defense" could not have been developed earlier, such as if it had arisen from newly discovered evidence.

¶ 15     In any event, the record shows that prior defense counsel was well aware of the technical aspects of this case.  When that counsel first requested and received a continuance on February 3, 2014, he argued that there was "[p]retty complex internet legal service that needs be done before I can even subpoena the materials that I'm going to need to prepare for trial."  Later, on May 5, 2014, defense counsel requested and received another continuance because he had "received 10 disks . . . which includes Google search warrant executions, videos, computer forensic information.  And that's all information that is beyond the scope of my expertise."

¶ 16     At that time, defense counsel also advised the court, "I have a request in for approval for an expert to help me review all of the computer forensics in this case."  True, successor counsel later told the court that the expert had not been approved until January.  But this delay of over seven months must be attributed to the defense.

¶ 17     As well, the record supports the trial court's finding that since the original trial date of April 1, 2014, numerous continuances had already been granted — three of which were at Garrison's request.

*See People v. Casias*, 2012 COA 117, ¶ 21 n.3 (There was no abuse of discretion where "the case had been pending for over two and a half years," and "the court had already granted defendant two continuances.").

¶ 18    Still, Garrison argues that a continuance should have been granted because this was his new counsel's first request.  But Garrison cites no authority, nor have we found any in Colorado, that prior continuances are disregarded once new counsel has been appointed.  To the contrary, in *People in Interest of J.T.*, 13 P.3d 321, 322 (Colo. App. 2000), the division upheld denial of a continuance, even though new counsel had been appointed "three weeks before," because "the case had been pending for over six months and had been previously continued twice at [defendant's] request."

¶ 19    Undaunted, Garrison argues that a continuance was needed because his new counsel was not prepared for trial.  And during the trial, his counsel repeatedly sought a continuance on this basis. But the record belies this argument.  It shows that Garrison's counsel "gave an opening statement; examined and cross-examined witnesses" extensively, including the police officers who testified

about IP addresses, as discussed below; "preserved objections to evidence; gave significant input on jury instructions; and presented a lengthy closing argument." *People v. Alley*, 232 P.3d 272, 274 (Colo. App. 2010) (upholding denial of a continuance).

¶ 20 For these reasons, we discern no abuse of the court's discretion.

¶ 21 Further, even if the trial court abused its discretion, to obtain a reversal, Garrison must also "demonstrate actual prejudice arising from denial of the continuance." *People v. Denton*, 757 P.2d 637, 638 (Colo. App. 1988). But the prejudice argued by Garrison involves only charges related to the IP testimony:

> After the motion to continue was initially denied, the only option left was to present a significantly hampered defense with a blind expert and without the ability to understand the technological intricacies of computer hacking, spoofing and how to find evidence of hacking or spoofing.

He does not even suggest that the continuance denial caused prejudice related to his convictions for possessing a defaced firearm and felony menacing. Thus, because we have given Garrison a new trial on his convictions related to the IP testimony, as discussed in the next section, no prejudice has occurred.

¶ 22    In sum, we discern no basis for reversal in denying Garrison's motion for a continuance.

### III.  The Trial Court Abused Its Discretion by Allowing Police Officers, Testifying as Lay Witnesses, to Testify About Tracing IP Addresses

¶ 23    Before trial, defense counsel noted her "concern about the . . . type of evidence that the [prosecution] is going to attempt to introduce via lay witnesses, being police officers."  She asked that "police officers not be able to give expert testimony" on computer evidence.  The prosecutor responded that the police officers' testimony did not require any specialized knowledge because it involved "get[ting] a warrant and compar[ing] two sets of data . . . which they do all the time."  The trial court declined to rule, explaining that it would "listen to the evidence" and "handle it as it happens."[2]

¶ 24    Mark Garcia, one of the investigating detectives, was the first officer to take the witness stand.  Testifying as a lay witness, he

---

[2] Despite this forewarning, the prosecutor did not seek leave to endorse as an expert an officer whose report of a forensic examination of Garrison's computer had been produced to the defense.

9

explained that during the investigation, warrants were issued for

"emails, facebook messages, and stuff like that."  He added,

> You can get the actual emails, text messages if
> they are still there and have not been
> destroyed, as well as you can get the internet
> protocol address on where the messages are
> coming from or who set up the account.  When
> you go online, you set up an account, you fill
> out all the documents.[3]

The trial court overruled defense counsel's objection that Garcia

was giving expert testimony.

¶ 25     Next, Garcia testified:

> We sent Google a production of records for the
> internet protocol address.  We provided
> Go[o]gle with the email address of [the Gmail
> account] and email addresses that basically
> were being used.  Go[o]gle then provided the
> internet protocol addresses.  They provided

---

[3] As one court explained, "[a]n IP number, also known as an Internet Protocol ('IP') address, 'is the unique address assigned to a particular computer connected to the Internet.  All computers connected to the Internet have an IP address.'  Daniel J. Solove, Digital Dossiers and the Dissipation of Fourth Amendment Privacy, 75 S. Cal. L. Rev. 1083, 1145 (2002).  'IP addresses are either static — associated with one computer — or dynamically assigned.  The latter is usually the case for patrons of dial-up Internet Service Providers (ISP) . . . .  Static addresses are undoubtedly easier to trace, but ISPs generally log the assignments of their dynamic addresses.'  Elbert Lin, *Prioritizing Privacy: A Constitutional Response to the Internet*, 17 Berkeley Tech. L.J. 1085, 1104 n.101 (2002)."  *United States v. Steiger*, 318 F.3d 1039, 1042 (11th Cir. 2003).

> two. And what we get is just numbers. And
> with the numbers that [sic] we did the
> research . . . .

Again, the trial court overruled defense counsel's objection.

¶ 26     Then, Garcia took the investigation to its culmination:

> Q. And you have said there was two numbers.
> So they were associated with that [Gmail]
> account?
>
> A. Yes.
>
> Q. And in your investigation, did you
> determine where those two IP addresses
> belong?
>
> A. Yes.
>
> Q. Who belonged to those IP addresses?
>
> A. Yes.
>
> Q. What did you determine in your
> investigation?
>
> A. One belonged to Century Link and another
> belonged to Comcast.
>
> Q. And did you review the investigation as it
> pertains to the IP addresses for those two?
>
> A. Along with Officer Calloway.
>
> Q. And what did that investigation reveal?
> Were you able to determine based on your
> investigation with Comcast and Century Link
> who owned those IP addresses?

Defense counsel: Objection. I renew my objection.

The Court: Overruled. There's been an adequate foundation in the context of the investigation for this officer to testify. It doesn't step over into expert testimony in my view. Overruled. You may answer that question.

A. Yes, we completed a production of records search warrant and sent them to the companies requested on who owns the IP addresses.

Q. And what was the result of that investigation?

A. One address returned back to [Garrison's wife's home] . . . . And the other one returned back to her employer . . . .

¶ 27    Officer Charles Calloway testified next, also as a lay witness. By now, the trial court had given defense counsel a standing objection. According to Calloway:

Q. You got an IP address, a couple of IP addresses that you said were associated with the [Gmail account]. You said that you sent those to your computer guys, investigation folks?

A. Yes.

Q. And then what is the next step in the process?

12

A. . . . those IP addresses came to Century Link and Comcast which I sent search warrants to both Century Link and Comcast.

Q. What were the results of those search warrants?

A. One came back to the address [of Garrison's wife and the other to her employer] . . . .

¶ 28 At the end of Calloway's testimony, the trial court asked him a juror's question: "Regarding the warrant to Google, what specific information was requested?  Was there just a date range only requested or specific account names only?"  Calloway answered:

The warrant to Google what I was requesting is all pretty much everything I can get from Google: The names, log in times, log out times. Anything dealing with that account.  And what they produced back is to gave [sic] me a disk which had a lot of information on there.  And one of the sheets on the paper were IP addresses.  And those had — there were two distinct IP addresses . . . .  [B]ut those two IP addresses it was determined came from singularly from Century Link and Comcast.

And the thing with Google when people create a[n] account with Google like any [of] us can go on Google and create an account, that's like a public account type.  So what they give you is an IP addresses back.  And then from there you see who is the provider.  Century Link and Comcast.  And so another warrant had to be done that way to find out where those locations are coming from.  Because the IP address is as it says like an address of that

13

computer specific on there.  So that's the information I got back.

¶ 29    The "sheets of paper" to which Calloway referred included the following undifferentiated character string:

> Google Confidential and Proprietary * ############### GOOGLE SUBSCRIBER INFORMATION Name: [victim] e-Mail: [victim]@gmail.com Status: Deleted End of Service Date: 2013/06/05-20:52:19-UTC[4] Services: Doritos, Gmail, Google Talk, Google+, Has Google Profile, Has Plusone, Picasa Web Albums, Web History Created on: 2012/09/12-19:33:40-UTC IP: 72.164.141.178, on 2012/09/12-19:33:40-UTC Language Code: en +------------------------+----------------+--------+
> | Time                   | IP Address     | Type   |
> +------------------------+----------------+--------+
> | 2013/05/19-13:18:51-UTC | 75.71.210.36 | Login  || 2013/05/04-16:21:52-UTC | 75.71.210.36   | Login  || 2013/04/19-15:52:58-UTC | 72.164.141.178 | Logout | 2013/04/19-15:49:12-UTC | 2.164.141.178 | Login  || 2013/04/19-15:44:56-UTC | 72.164.141.178 | Logout || 2013/04/19-15:36:15-UTC | 72.164.141.178 | Login  | 2013/04/19-15:20:12-UTC | 2.164.141.178 | Logout || 2013/04/19-15:09:08-UTC | 72.164.141.178 | Login  |+------------------------+----------------+--------+
> ############# * Google Confidential and Proprietary * #############

---

[4] UTC is a worldwide time standard, not a time zone.

## A. Standard of Review

¶ 30    As always, a trial court's evidentiary rulings — including those involving expert testimony — are reviewed for an abuse of discretion. *People v. Howard-Walker*, 2017 COA 81, ¶ 44. The trial court abuses its discretion if, among other things, its decision "is based on a misunderstanding or misapplication of the law." *People v. Thompson*, 2017 COA 56, ¶ 91.

¶ 31    When an abuse of discretion occurs, "[w]e review nonconstitutional trial errors that were preserved by objection for harmless error." *Howard-Walker*, ¶ 44 (citation omitted). Evidentiary rulings involving experts are reviewed as such errors. Under this standard, reversal results only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (citation omitted).

## B. Law

¶ 32    CRE 701 governs admission of lay testimony:

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not

15

based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

¶ 33    After Garrison's trial, our supreme court "clarified the standard that distinguishes lay testimony from expert testimony," *Howard-Walker*, ¶ 50, in three opinions: *Marsh v. People*, 2017 CO 10M; *Venalonzo v. People*, 2017 CO 9, ¶¶ 17-25; and *People v. Ramos*, 2017 CO 6.

¶ 34    Take the standard first.  To determine "whether testimony is lay testimony under CRE 701 or expert testimony under CRE 702, the trial court must look to the basis for the opinion."  *Venalonzo*, ¶ 23.

¶ 35    Then consider its reasoning.  To distinguish between lay and expert testimony, "the proper inquiry is not whether a witness draws on her personal experiences to inform her testimony; all witnesses rely on their personal experience when testifying."  *Id.* at ¶ 22.  Rather, "the nature of the experiences that could form the opinion's basis . . . determines whether the testimony is lay or expert opinion."  So, expert testimony "is that which goes beyond the realm of common experience and requires experience, skills, or knowledge that the ordinary person would not have."  *Id.*

16

¶ 36    The supreme court recognized that this "distinction can be a difficult one." *Id.* at ¶ 24. To be sure, "[t]his is particularly the case when the witness is a police officer." *Howard-Walker*, ¶ 51.

### C. Application

#### 1. Trial Error

¶ 37    The controlling question is would "ordinary citizens . . . be expected to know certain information or to have had certain experiences." *Venalonzo*, ¶ 24 (citation omitted). Summarizing several cases in which the distinction between lay and expert police officer testimony has been addressed provides context for answering this question.

¶ 38    The saga begins with *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002), where a police officer testified about a crime scene investigation and accident reconstruction without being qualified as an expert. In finding an abuse of discretion, the supreme court held that the officer's testimony about his observations of the crime scene and investigation were admissible as lay opinion testimony. But his "deductions about . . . the vehicle's direction, position, and speed" during the accident required specialized training and

17

knowledge and were therefore admissible only as expert testimony. *Id.* at 124.

¶ 39    In *People v. Veren*, 140 P.3d 131, 138-39 (Colo. App. 2005), cited with approval in *Venalonzo*, the division considered a police officer's testimony "that possession of a large amount of nonprescription pseudoephedrine is indicative of a person's intent to use such a product as a precursor in the manufacture of methamphetamine." The division recognized that "certain basic information about drugs may properly fall within the scope of lay opinion testimony." *Id.* at 139. Even so, it held that "the amount of pseudoephedrine required to manufacture methamphetamine is not within the common knowledge of ordinary citizens, but rather requires specialized knowledge." *Id.* The division did not explain the basis on which it drew this line.

¶ 40    In *Romero v. People*, 2017 CO 37, ¶ 10, a sexual assault on a child case, the supreme court considered a police officer's testimony as a lay witness about the concept of "grooming" a victim.[5] The

---

[5] "'Grooming' is a process sexual predators use to shape a child's perspective and lower the child's inhibitions with respect to later criminal sexual acts. *See* Daniel Pollack & Andrea MacIver, *Understanding Sexual Grooming in Child Abuse Cases*, 34 Child L.

18

court held that "an ordinary citizen could not be expected to possess the experience, skills, or knowledge required to understand the concept of 'grooming' as it relates to sexual predation." *Id.* at ¶ 15. This is so because "[t]he methods sex offenders use are not necessarily common knowledge." *Id.* (citation omitted). The court based this conclusion on out-of-state authority.

¶ 41 In *Ramos,* ¶ 9, the supreme court held that an ordinary citizen could not be expected to differentiate between "blood cast-off" and "blood transfer." The court noted that the testifying officer had referred to his nineteen years of experience investigating crime scenes.

¶ 42 Finally, only one division of this court has applied *Venalonzo* in a published criminal case. *Howard-Walker,* ¶¶ 52-53. The division found an abuse of discretion in admitting lay testimony because "we strongly doubt that ordinary citizens can determine whether a gun depicted in a video was real or fake." *Id.* at ¶ 53. Similar to *Veren,* however, the division did not explain how it came to this conclusion.

---

Prac. 161, 161 (2015)." *State v. Muccio,* 890 N.W.2d 914, 924 (Minn. 2017).

¶ 43    Of course, "[w]hether a witness's testimony is lay or expert depends on the facts and surrounding circumstances of the case and 'requires a case-by-case analysis of both the witness and the witness's opinion.' *United States v. Smith*, 591 F.3d 974, 982-83 (8th Cir. 2010)." *Venalonzo*, ¶ 17.  Two tools have been identified for chopping through the thicket of case-by-case analysis: precedent (*Romero*) and the testifying officer's reliance on lengthy experience (*Ramos*).  But *Veren* and *Howard-Walker* emerged without having relied on either tool.

¶ 44    A closer look at *Venalonzo* shows that the reviewing court's own experience and common sense inform the decisional process, even without an evidentiary basis.

> The ordinary person has spent time with children and could reasonably be expected to know that they are not as accurate or perceptive as adults.  Similarly, an ordinary person could be expected to know that children are more apt to share information with their peers than with adults, especially if they are unsure whether they may have done something wrong and fear being punished. Because an ordinary person who interacts with children can recognize these behaviors without additional training or specialized experience, this information is lay opinion testimony.

*Venalonzo*, ¶ 28.

20

¶ 45    With only this much for guidance, we turn to the arcane intricacies of IP addresses.  The trial court did not make findings on what — if anything — an ordinary person would be expected to know about this subject.[6]  Instead, the court admitted the testimony as being part of "the context of the investigation."

¶ 46    Yet, the prosecution's attempt to present testimony about the course of an investigation does not open the floodgates to improper lay testimony by the investigating officers.  Recall, where an officer's testimony is "based not only on her perceptions and observations of the crime scene," but also on specialized knowledge or experience, the officer "must be properly qualified as an expert."  *Stewart,* 55 P.3d at 124.

¶ 47    Instead, the question remains: What would "ordinary citizens . . . be expected to know" about IP addresses?  *Venalonzo,* ¶ 22 (citation omitted).  The record does not provide an answer.  Nor would that question likely be the subject of evidence, unless the trial court held a *People v. Shreck,* 22 P.3d 68 (Colo. 2001), hearing. No such hearing was held.

---

[6] The trial court did not have the benefit of *Venalonzo* when it ruled.

¶ 48    Everyone would agree that e-mail has become "a significant form of communications."  1 Raymond T. Nimmer, *Information Law* § 8:53, Westlaw (database updated May 2017).  At least 250 reported Colorado cases refer to "e-mail."  For this reason, an ordinary person may have some idea of what role an IP address plays in e-mail.  Likewise in *Veren*, 140 P.3d at 139, the methamphetamine epidemic may have explained the division's willingness to conclude — without record support — that ordinary people probably know Sudafed contains an ingredient that can be used to manufacture methamphetamine.

¶ 49    But the testimony by Detective Garcia and Officer Calloway went much farther.

¶ 50    Would the character string produced by Google be more than a maze to the ordinary person?  Probably not.  *See Ali v. State*, No. 1252 Sept. Term 2014, 2017 WL 128636, at *5 (Md. Ct. Spec. App. Jan. 13, 2017) (unpublished opinion) ("[T]he detective based his conclusions on subpoenaed documents that were not themselves self-explanatory, but required some degree of specialized training and erudition to interpret.").  But the officers picked out the IP addresses.

¶ 51	Yet, even if an ordinary person could also pick out the IP addresses, why would such a person know more than Officer Calloway? After all, he acknowledged that after having received these addresses from Google, he sent them to the department's computer investigators to identify the associated ISPs.

¶ 52	And what reason would an ordinary person have to understand the final step in the investigation — an ISP's ability to trace an IP address to a particular customer's physical location? The Attorney General does not suggest such a reason, nor can we discern one.

¶ 53	Still, because Colorado courts have not yet "addressed the line between lay and expert testimony in the context of" IP addresses, "case law from other jurisdictions is informative." *Venalonzo*, ¶ 21. In *Ali*, 2017 WL 128636, at *5, the court said, "the nature of an IP address, and particularly the arcane question of whether each IP address is 'unique' to a particular device or network, is a question of computer science that is beyond the ken of ordinary laypersons and, hence, 'ordinarily should be the subject of expert testimony.'" (Citation omitted.) *See also Hydentra HLP Int'l Ltd. v. Luchian*, No. 1:15-CV-22134-UU, 2016 WL 5951808, at *11 (S.D. Fla. June 2,

23

2016) (unpublished opinion) ("In this case, the testimony of Jason Tucker is plainly offered to support the broad claim that Defendants themselves uploaded some of the copyright videos onto their websites based upon his review of the 111 IP addresses. This proposition is an inference well beyond what witnesses perceive in their day-to-day lives."); *cf. NTP Marble, Inc. v. AAA Hellenic Marble, Inc.,* No. 09-CV-05783, 2012 WL 607975, at *6 (E.D. Pa. Feb. 27, 2012) (unpublished opinion) ("The dispute implicates the significance of unique IP addresses and web-based email accounts. How these tools are obtained, maintained, monitored, controlled, and accessed are not matters of 'common knowledge.'") (decided based on judicial notice).

¶ 54     The relative paucity of precedent addressing common knowledge of IP addresses may be explained because in the vast majority of reported cases, testimony on IP addresses has been presented through expert witnesses.[7]  In any event, the Attorney General does not cite authority contrary to *Ali* and *Hydentra*.[8]

---

[7] *See, e.g., United States v. Wyss*, 542 F. App'x 401, 404-06 (5th Cir. 2013) (unpublished opinion) (expert testified on the examination and comparisons of the defendant's IP addresses); *United States v. Weste*, 419 F. App'x 507, 509 (5th Cir. 2011) (unpublished opinion)

¶ 55     These two cases further persuade us that the concept of an

e-mail transmission including an IP address, which can be linked to

an ISP, and in turn traced to the physical location of a particular

ISP customer, is not within the knowledge or experience of ordinary

people.  Thus, because some of the police testimony on direct

examination was based on particular experience and specialized

knowledge within the scope of Rule 702, we conclude that the trial

---

(Expert testified "that the IP addresses from which several of the threatening emails were sent could be traced to [the defendant]."); *United States v. Kassir*, No. S204CR356(JFK), 2009 WL 910767, at *2 (S.D.N.Y. Apr. 2, 2009) (unpublished opinion) ("Testimony linking [an organization] to various email addresses and websites allegedly operated by [the] [d]efendant" was admissible, however a "hearing is necessary to determine whether [the witness] is qualified to testify as an expert on this subject."); *Leser v. Penido*, 947 N.Y.S.2d 441, 442 (N.Y. App. Div. 2012) (expert linked the defendant's IP addresses and a telephone number to the subject website and to his own business website).

[8] *But see United States v. Walpole*, 543 F. App'x 224, 228 (3d Cir. 2013) (unpublished opinion) ("That she was permitted to describe what an IP address is . . . does not amount to plain error.  While [that] term[] may not be common in everyday conversation, the prevalence of online photo-sharing — where IP addresses . . . are constantly used — indicates that it was not plainly erroneous to allow the agent to name these commonly used features of computer communication without being qualified as an expert . . . .").

court abused its discretion in admitting this portion of the testimony as lay testimony.[9]  *See* CRE 701(c).

## 2.  Harmless Error

¶ 56    "The inquiry is not at an end, however, because we review a trial court's abuse of discretion on a preserved, nonconstitutional issue for harmless error."  *Romero*, ¶ 16.  For the following three reasons, we further conclude that because the error was not harmless, reversal is required.

¶ 57    First, one need look no further than the opening statement to see the importance of the IP address testimony.  As the prosecutor explained, based on the threatening e-mails being sent to Garrison and his wife, the police officers "first cited [the victim] for harassment," and then "put together a stalking case against [the victim], arrested him, [and] put him in jail."  Not until investigators traced the IP addresses did they determine that the e-mails had not been sent by the victim.  According to the prosecutor, "we were

---

[9] Given this conclusion, we need not address the Attorney General's argument that because testimony on spoofing first arose during defense counsel's cross-examination of Officer Calloway, redirect on this subject was not improper expert testimony from a lay witness. Nor need we address Garrison's argument about improper expert testimony from the prosecution's rebuttal witness, which is unlikely to arise on retrial.

close to prosecuting a case against [the victim] until this relaventory [sic] information" surfaced.

¶ 58    Second, while no direct evidence showed that Garrison had used the Gmail account — which he denied — the investigators' ability to trace many of those e-mails to an IP address linked to his home must have loomed large over the jury's deliberations.  But apart from this linkage, and with his wife also having been implicated in both IP addresses, the evidence that Garrison knew the Gmail account did not belong to the victim was far from overwhelming.  *See id.* ("We cannot hold, with a lack of overwhelming evidence, that the trial court's abuse of discretion was harmless error.").

¶ 59    Third, unlike in *Marsh,* ¶ 42, the IP address testimony was neither brief nor merely "general background information."

¶ 60    In the end, we conclude that Garrison is entitled to a new trial on his convictions for first degree perjury, attempt to influence a public servant (three counts), and conspiracy to attempt to influence a public servant, all of which turned on the e-mails which the Garrisons presented as having come from the victim.

## IV. Conclusion

¶ 61    The judgment is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.

JUDGE BOORAS and JUDGE FREYRE concur.